No. 16-2065

# In the United States Court of Appeals
# For the Fourth Circuit

———————

KIMBERLY STODDARD,

*Plaintiff-Appellant,*

– v. –

FIRST UNUM LIFE INSURANCE COMPANY,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Middle District of
North Carolina at Greensboro in No. 1:15-CV-00965 (Hon. Catherine C. Eagles)

# APPELLANT'S OPENING BRIEF

EDWARD G. CONNETTE
CAITLIN H. WALTON

ESSEX RICHARDS, P.A.
1701 South Boulevard
Charlotte, North Carolina 28203
(704) 377-4300
econnette@essexrichards.com
cwalton@essexrichards.com

*Counsel for Plaintiff-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  16-2065         Caption:  Kimberly H. Stoddard v. First Unum Life Insurance Company

Pursuant to FRAP 26.1 and Local Rule 26.1,

Kimberly H. Stoddard
(name of party/amicus)


who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                          ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                              ☐YES ☑NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/Edward G. Connette                    Date:    10/2/2016

Counsel for: Kimberly H. Stoddard

## CERTIFICATE OF SERVICE
**************************

I certify that on    October 2, 2016    the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

James A. Dean
Womble Carlyle Sandridge & Rice
jdean@wcsr.com

/s/Kimberly H. Stoddard                                      10/2/2016
        (signature)                                              (date)

## **<u>TABLE OF CONTENTS</u>**

CORPORATE DISCLOSURE STATEMENT

TABLE OF CONTENTS..................................................................................... i

TABLE OF AUTHORITIES ............................................................................ iv

STATEMENT OF JURISDICTION.................................................................. 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 1

STATEMENT OF THE CASE........................................................................... 2

        A. Stoddard's Work History and Occupation.................................................. 4

        B. Stoddard's Disability and Benefit Application ........................................... 5

        C. Stoddard's Neuropsychological Evaluations ............................................. 6

        D. Stoddard's Continuing Symptoms ............................................................ 8

        E. Unum's Termination of Stoddard's Benefits ........................................... 10

SUMMARY OF ARGUMENT ...................................................................... 12

ARGUMENT ................................................................................................ 13

        I.      THE APPELLATE STANDARD OF REVIEW ............................... 13

        II.     THE ERISA STANDARD OF REVIEW .......................................... 14

        III.    UNUM ABUSED ITS DISCRETION IN TERMINATING
                STODDARD'S BENEFITS ............................................................. 15

                1.     The Vocational Evidence Substantiates Stoddard's
                        Disability .................................................................... 15

i

2.    Unum Failed to Evaluate Stoddard's Limitations in the
      Context of MS ......................................................................... 20

3.    Unum Improperly Discredited Stoddard's Subjective
      Complaints ............................................................................... 23

4.    Unum Failed to Properly Weigh the Evidence ....................... 26

5.    Unum's Attack on Stoddard's Credibility is Baseless ............ 37

      a.    Stoddard Was Forthcoming About Her Activity
            Level ............................................................................. 37

      b.    Unum Failed to Utilize Readily Available
            Investigatory Procedures ............................................... 39

6.    The District Court Erred in its Application of the *Booth*
      Factors. .................................................................................... 44

      A.    The adequacy of the materials considered to make
            the decision and the degree to which they support
            it ................................................................................... 44

      B.    Whether the decision-making process was
            reasoned and principled ................................................. 46

      C.    Whether the decision was consistent with the
            procedural and substantive requirements of ERISA ..... 49

      D.    Any external standard relevant to the exercise of
            discretion ...................................................................... 50

            1. Unum Disregarded the Evidentiary Finding of
               the ALJ ................................................................ 50

            2. Unum Failed to Provide the Full SSA Opinion
               to its Reviewers. ................................................. 52

E.    The fiduciary's motives and any conflict of interest it may have ................................................... 55

CONCLUSION ..................................................................... 58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iii

# TABLE OF AUTHORITIES

## Cases

*Addis v. Ltd. Long-Term Disability Program*,
   425 F. Supp. 2d 610 (E.D. Pa. 2006), *aff'd*, 268 F.App'x 157 (3d Cir. 2008)......21

*Barber v. Sun Life & Health Ins. Co.*,
   894 F. Supp. 2d 174 (D. Conn. 2012)...................................................................25

*Bencivenga v. Unum Life Ins. Co. of Am.*,
   2015 U.S.Dist.LEXIS 39117 (E.D. Mich. Mar. 27, 2015)...................... 39, 40, 41

*Bernstein v. Capitalcare, Inc.*,
   70 F.3d 783 (4th Cir. 1995) ...............................................................................46

*Boggio v. Hartford*,
   2009 U.S.Dist.LEXIS 25478 (D. Kan. March 25, 2009) ....................................55

*Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan*,
   201 F.3d 335 (4th Cir. 2000) ...................................................................... passim

*Case v. Cont'l Cas. Co.*,
   289 F. Supp. 2d 732 (E.D. Va. 2003) .................................................................45

*Chavarria v. Metro. Life Ins. Co.*,
   69 F. Supp. 3d 596 (E.D. La. 2014)....................................................................53

*Cone v. Carpenter*,
   2016 U.S.Dist.LEXIS 54052 (W.D. Tenn. Mar. 31, 2016)..................................17

*Conkright v. Frommert*,
   559 U.S. 506 (2010)............................................................................................14

*Cosey v. Prudential Ins. Co. of Am.*,
   735 F.3d 161 (4th Cir. 2013) ..............................................................................23

*Crespo v. Unum Life Ins. Co. of Am.*,
   294 F. Supp. 2d 980 (N.D. Ill. 2003)..................................................................36

*Cury v. Colonial Life Ins. Co.*,
   737 F. Supp. 847 (E.D. Pa. 1990).........................................................................9

*Doe v. Unum Life Ins. Co. of Am.*,
  35 F. Supp. 3d 182 (D. Mass. 2014) ....................................................33

*DuPerry v. Life Ins. Co. of N. Am.*,
  632 F.3d 860 (4th Cir. 2011) ...................................................... passim

*Ellis v. Metro. Life Ins. Co.*,
  126 F.3d 228 (4th Cir. 1997) ...................................................... 13, 55

*Ettel v. Unum Life Ins. Co. of Am.*,
  2008 U.S.Dist.LEXIS 103419 (W.D. Wash. Dec. 10, 2008) ................. 34, 42, 50

*Evans v. Eaton Corp. LTD Plan*,
  514 F.3d 315 (4th Cir. 2008) ....................................................43

*Evans v. UNUMProvident Corp.*,
  434 F.3d 866 (6th Cir. 2006) ....................................................40

*Farina v. Temple Univ. Health Sys. LTD Plan*,
  2009 U.S.Dist.LEXIS 36166 (E.D. Pa. Apr. 27, 2009).......................................21

*Firestone Tire & Rubber Co. v. Bruch*,
  489 U.S. 101 (1989)....................................................14

*Hall v. Metro. Life Ins. Co.*,
  259 Fed. Appx. 589 (4th Cir. 2007)....................................................49

*Harrison v. Wells Fargo Bank, N.A.*,
  773 F.3d 15 (4th Cir. 2014) ....................................................43

*Harvey v. Astra Merck Inc. LTD Plan*,
  348 F. Supp. 2d 536 (M.D.N.C. 2004) .................................................. 24, 25, 41

*Hines v. Unum Life Ins. Co. of America*,
  110 F. Supp. 2d 458 (W.D. Va. 2000)........................................................ 52, 54

*Johnson v. Metro. Life Ins. Co.*,
  2008 U.S.Dist.LEXIS 110009 (W.D.N.C. Aug. 26, 2008) ........................... 46, 48

*LeFebre v. Westinghouse Elec. Corp.*,
  747 F.2d 197 (4th Cir. 1984) ....................................................47

*Macnally v. Life Ins. Co. of N. Am.*,
  2009 U.S.Dist.LEXIS 44423 (D. Minn. May 26, 2009) .....................................24

*Mead v. Reliastar Life Ins. Co.*,
  2015 U.S.Dist.LEXIS 89581 (D. Vt. July 10, 2015)............................................29

*Metro. Life Ins. Co. v. Glenn*,
  554 U.S. 105 (2008)........................................................................................49

*Mitchell v. Eastman Kodak Co.*,
  113 F.3d 433 (3d Cir. 1997) .............................................................................30

*Montero v. Bank of Am. Long-Term Disability Plan*,
  2016 U.S.Dist.LEXIS 178724 (W.D.N.C. Dec. 27, 2016)...................... 29, 48, 57

*Nickel v. UNUM Life Ins. Co. of Am.*,
  582 F. Supp. 2d 869 (E.D. Mich. 2008) .............................................................35

*Osbun v. Auburn Foundry, Inc.*,
  293 F. Supp. 2d 863 (N.D. Ind. 2003) ...............................................................38

*Reid v. Metro. Life Ins. Co.*,
  944 F. Supp. 2d 1279 (N.D. Ga. 2013)...............................................................18

*Rekstad v. U.S. Bancorp*,
  451 F.3d 1114 (10th Cir. 2006) .........................................................................35

*Robertson v. Std. Ins. Co.*,
  139 F. Supp. 3d 1190 (D. Or. 2015) ...................................................................52

*Rohr v. Designed Telecomms., Inc.*,
  2009 U.S.Dist.LEXIS 32404 (S.D. Ohio Mar. 30, 2009)....................................32

*Sexton v. Deloitte & Touche LTD Plan*,
  2003 U.S.Dist.LEXIS 5185 (D. Minn. Mar. 27, 2003) .......................................24

*Simmons v. Prudential Ins. Co. of Am.*,
  564 F. Supp. 2d 515 (E.D.N.C. 2008) ................................................................55

*Solnin v. Sun Life and Health Ins. Co.*,
  2015 U.S.Dist.LEXIS 146279 (E.D.N.Y. Oct. 28, 2015) ....................................33

*Thivierge v. Hartford Life & Accident Insur. Co.*,
  2006 U.S.Dist.LEXIS 25216 (N.D. Cal. March 28, 2006)....................................30

*Thomas v. ALCOA Inc.*,
  2008 U.S.Dist.LEXIS 67668 (D. Md. Sept. 5, 2008)...........................................52

*Walden v. Rexam, Inc.*,
  2007 U.S.Dist.LEXIS 40098 (D.S.C. June 1, 2007) ............................................52

*White v. Sun Life Assurance Co.*,
  488 F.3d 240 (4th Cir. 2007) ..........................................................................44

*Wilkinson v. Sun Life & Health Ins. Co.*,
  127 F. Supp. 3d 545 (W.D.N.C. 2015)..............................................................48

*Wilkinson v. Sun Life & Health Ins. Co.*,
  2017 U.S.App.LEXIS 201 (4th Cir. Jan. 5, 2017)...............................................43

*Williams v. Metro. Life Ins. Co.*,
  632 F. Supp. 2d 525 (E.D.N.C. 2008) ...............................................................44

*Yancy v. Utd. Omaha Life Ins. Co.*,
  2015 U.S.Dist.LEXIS 172233 (C.D. Cal. Dec. 18, 2015)....................................56


**Statutes & Other Authorities:**

20 CFR 404.1565 ............................................................................................51

28 U.S.C. § 1291 ..............................................................................................1

28 U.S.C. § 1331 ..............................................................................................1

29 U.S.C. § 1132(a)(1)(B) ..............................................................................2, 3

29 U.S.C. § 1132(e)(1)......................................................................................1

29 U.S.C. § 1133......................................................................................... 49, 50

Section 502(a)(1)(B) of ERISA .........................................................................2

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the parties and the subject matter pursuant to 29 U.S.C. § 1132(e)(1), authorizing actions brought under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and 28 U.S.C. § 1331, creating jurisdiction for actions arising under the laws of the United States. This Court has jurisdiction under 28 U.S.C. § 1291, this being an appeal from a final judgment issued in a civil action by a United States District Court. The district court's final judgment, dated September 1, 2016, disposed of all parties' claims.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Where Plaintiff-Appellant ("Stoddard") is entitled to long-term disability ("LTD") benefits when she is unable to perform the "material and substantial duties" of her "regular occupation," and where there is substantial evidence showing that she cannot work on a consistent and sustained basis because of her relapsing-remitting multiple sclerosis ("MS"), did the District Court err by concluding that the *Booth* factors supported a finding in favor of Defendant-Appellee ("Unum")?

2. Where the medical evidence supports Stoddard's disability, and where Unum improperly discredited her symptoms, did the District Court err by concluding that the medical evidence supported a finding in favor of Unum?

3. Where Unum selectively reviewed and ignored substantial evidence showing that Stoddard cannot perform the essential duties of her regular occupation, did the District Court err by finding that Unum is entitled to judgment as a matter of law?

## STATEMENT OF THE CASE

Stoddard's appeal challenges Unum's wrongful termination of LTD benefits under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

Stoddard has been a covered beneficiary under the Intermedia Advertising Group, Inc. ("IAG") Long-Term Disability Benefit Plan (the "Plan"). (J.A. 7). The Plan is fully insured by an LTD policy issued by Unum, and it delegates all LTD claims administration responsibility to Unum. (J.A. 7-8).

The Plan pays LTD benefits when Unum determines that:

- You are limited from performing the **material and substantial duties** of your regular occupation due to your sickness or injury; and
- You have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

(J.A. 102).

**Material and Substantial Duties** are duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Unum will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

2

(J.A. 116).

> **Regular Occupation** means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

(J.A. 117).

After finding Stoddard to be disabled for nearly a decade, Unum reversed course and wrongfully terminated her claim for LTD benefits. Having fully exhausted her administrative remedies, Stoddard filed suit in the Western District of North Carolina against Unum on August 24, 2015. (J.A. 1). Thereafter, the matter was transferred to the Middle District of North Carolina as the more proper venue. (J.A. 2). The Complaint sought relief for wrongful denial of Stoddard's LTD benefits, pursuant to 29 U.S.C. § 1132(a)(1)(B). (J.A. 7-12). The parties submitted cross-motions for summary judgment on May 16, 2016. (J.A. 17-36). The district court heard oral argument on August 31, 2016. (J.A. 5).

The district court denied Stoddard's motion for summary judgment, while granting Unum's motion, by order dated September 1, 2016. (J.A. 85). The district court found that Unum's decision to terminate Stoddard's benefits was reasonable. *Id.* Stoddard timely filed her Notice of Appeal on September 19, 2016. (J.A. 86-87). The district court did not issue a Memorandum Opinion, but rather recited its findings into the record from the bench at the conclusion of the August 31, 2016

hearing and issued an Order to that effect. (J.A. 79.1-83, 85).

A. Stoddard's Work History and Occupation.

Stoddard obtained a BFA in Industrial Design in 1989. (J.A. 201). Following graduation, she spent her career as a director in various creative and design positions, primarily within the information technology industry. *Id.* She served as a Creative Director for IAG, a research company that measured the effectiveness of television advertising and marketing through the collection of online data. (J.A. 130). Stoddard was responsible for all aspects of creative design and development. *Id.* She worked with management, marketing and design team members, freelancers, and a technical team to develop corporate and consumer websites, and the creation of site content and artwork for multiple marketing campaigns. (J.A. 24, 129-30, 702-03). Her job required extensive creative problem solving and communication skills, and knowledge of computers and cutting-edge design related software. *Id.*

Unum has determined that Stoddard's regular occupation required a <u>high aptitude</u> in the areas of: general learning ability, verbal aptitude, spatial aptitude, and form perception. (J.A. 555-56). Unum also determined that Stoddard's regular occupation required the following <u>constant</u> mental stress demands: short instruction memory; detailed instruction memory; concentration and attention; work schedule; work distractions; work decisions; work completion; public

4

interaction; work review; adaptation to change; and independent planning.[1] *Id.*

B. Stoddard's Disability and Benefit Application.

Stoddard was forced to stop working on June 4, 2004 due to incapacitating symptoms that later were diagnosed as MS. (J.A. 159, 670). She suffered extreme fatigue, an inability to concentrate, dizziness/vertigo, weakness, numbness, balance problems, double vision, partial hearing loss, muscle spasticity, insomnia, and an increasing inability to cope with daily stress. (J.A. 670). As a result, she lost the stamina, cognitive acuity, and creative edge demanded by her high-intensity occupation. *Id.* She applied for LTD benefits, and her claim was approved on December 30, 2005. (J.A. 239).

After approving her claim, Unum informed Stoddard that she was required to apply for Social Security Disability Insurance Benefits ("SSDI") under the Plan. (J.A. 279-80). Unum closely monitored Stoddard's application for SSDI and the Social Security Administration's ("SSA") review process. (J.A. 287, 313, 338-39, 344-45). Following an evidentiary hearing, Judge Bowling, an Administrative Law Judge ("ALJ"), concluded on February 16, 2011, that while Stoddard's condition did prevent her from doing any of her past jobs, her condition did not prevent her from doing less demanding work. (J.A. 348-62). Thus, she was not considered by the SSA to be totally disabled under its regulations. (J.A. 362).

_____

[1] "Constant" means an activity or condition exists 2/3 or more of the time (5.5+ hours per 8-hour workday). (J.A. 556).

C. Stoddard's Neuropsychological Evaluations.

Stoddard has undergone three neuropsychological evaluations. While there was no pre-MS testing, Stoddard's physicians have estimated her baseline neuropsychological ability to be in the superior range. (J.A. 544, 547, 736, 738-39, 750). The baseline score is used when tracking deterioration of an individual's cognitive processes. (J.A. 738).

Stoddard's first neuropsychological evaluation was conducted by Vincent Maginn, Ph.D on September 6, 2007. (J.A. 746-50). Stoddard demonstrated weaknesses in areas of: attention and working memory (working memory score in the 66 percentile, within average range); speed of information processing (score in the 47 percentile, within average range); attention to visual detail and sequencing (average); and verbal learning and memory (average). (J.A. 748-49).

Stoddard's second neuropsychological evaluation was conducted by Alexander Troster, Ph.D on May 28, 2008. (J.A. 540-48). Stoddard's speed of processing information score was in the 87th percentile (high average). (J.A. 544). Stoddard scored in the 77th percentile (high average) in the area of attention and working memory. (J.A. 545). Further, "Stoddard's performance was intact (average), albeit below estimated premorbid levels, on a task of divided auditory attention." *Id.* Stoddard fell within the mildly impaired range on a visual selective attention task, scoring in the 8th percentile. *Id.* Stoddard performed in the

6

borderline impaired range in tasks related to executive functioning, which required conceptualization and cognitive flexibility in response to the examiner's feedback. *Id.* Troster concluded that Stoddard's "deficits in complex attention and executive functioning (which were elicited in a quiet, distraction-free environment on a 'good' day symptomatically) would likely negatively impact her ability to meet the demands of her previous employment." (J.A. 547).

Stoddard's third neuropsychological evaluation was conducted over three days in February 2015 by Kristine Herfkens, Ph.D. (J.A. 735-43). Stoddard's working memory score was in the low average range, which is significantly worse than her score in either 2007 (average) or 2008 (high average). (J.A. 738). Stoddard's speed of processing information decreased since the 2008 evaluation, resulting in a score in the 77th percentile (2008: 87th percentile). *Id.* Similarly, Stoddard performed worse on tasks demanding divided auditory attention compared with the 2008 evaluation, earning a score in the 18th percentile (borderline impaired). (J.A. 737, 740). Stoddard's basic auditory attentional ability score was at the 63rd percentile (average), while sustained concentration was in the 37th percentile. *Id.* On a test of auditory verbal learning, she scored in the 55th percentile (average). *Id.* On a test of immediate auditory verbal memory (contextual memory), she scored in the 21st percentile (borderline impaired). *Id.* On a test of visuospatial functioning, Stoddard scored in the average range for

7

visuospatial construction of a complex figure. *Id.*

D. Stoddard's Continuing Symptoms.

Stoddard experiences exacerbations of her old symptoms, with varying degrees of intensity ranging from mild to severe.[2] (J.A. 328-33, 468-93, 533-52, 631-63). These symptoms include fatigue, cognitive deficits, diplopia, muscle spasms, and numbness, as well as "brown-outs" several times per week, wherein she "shuts down" and must rest for several hours to "reboot." (J.A. 541).

After Stoddard's doctors developed the best treatment plan, the frequency of her medical appointments decreased.[3] (J.A. 142, 146, 256, 329, 333, 582). Stoddard largely managed her symptoms through medication and annual visits to her neurologists. (J.A. 359). In 2007, Stoddard saw neurologist Dr. Silva Markovic-Plese, who noted that, while Stoddard's last relapse occurred "approximately two years ago," she remained symptomatic and was experiencing heat intolerance, fatigue, balance difficulties, dizziness, lack of concentration, right-sided weakness, decreased sensation, and occasional muscle cramping and tightness in all four extremities. (J.A. 331-33).

On February 13, 2008, Stoddard again saw Markovic-Plese, who noted that Stoddard was experiencing fatigue, imbalance, numbness, spasms, and occasional

---

[2] Stoddard said she is uncertain what qualifies as a "flare-up," but has consistently reported that she remains symptomatic. (J.A. 359).
[3] Stoddard was prescribed Rebif, an interferon medication used to treat relapsing-remitting MS. (J.A. 633). It is injected under the skin 3x-per-week. *Id.*

dizziness. (J.A. 328). Additionally, Stoddard had "deficits to include poor concentration and memory." *Id.* Over the next five years, Stoddard managed to control her symptoms through ongoing medication and follow-up visits, while continuing to experience fatigue, balance problems, and cognitive difficulties. (J.A. 468-69).

On May 9, 2013, Stoddard reported that, while she did not have any new symptoms, she continued to experience fatigue and ongoing double/blurred vision. (J.A. 475). Her concentration deficits had worsened over the last year. *Id.* On July 18, 2013, Stoddard reported fatigue and dizziness. (J.A. 483-84).

On January 30, 2015, Stoddard presented with imbalance, gait dysfunction and MS-related fatigue. (J.A. 633). Stoddard's Dynamic Gait Index ("DGI") score, which is an assessment tool used to measure a patient's ability to change gait with varying demands, was 18/24, a score that indicates Stoddard was at increased risk for falls.[4] *Id.*

At a February 4, 2015 appointment, Stoddard reported problems with insomnia, likely caused by spasticity.[5]   (J.A. 648-49). The physician stated insomnia could be worsened by Rebif, "which makes [Stoddard] feel sick at baseline and she does not sleep at all on the three days of the week she gets the

---

[4] A score of 20 or less is indicative of increased fall risk. (J.A. 633-34).

[5] Spasticity refers to weakness, stiffness and involuntary muscle spasms. It is a common symptom of MS. *Cury v. Colonial Life Ins. Co.*, 737 F. Supp. 847, 850 (E.D. Pa. 1990).

injections."[6] (J.A. 649). During a February 16, 2015 appointment, Stoddard's physician noticed her "slowness of processing" and recommended that she follow-up with her neurologist. (J.A. 661).

At least six brain MRI's, beginning in 2004 and continuing periodically through June 10, 2014, consistently reveal multiple white matter lesions and other indicia of MS. (J.A. 190-91, 326-37, 505-07, 512). The distribution of Stoddard's lesions has remained largely unchanged, signifying no improvement in her disease. (J.A. 505-06).

Stoddard's treating professionals – Markovic-Plese (J.A. 248-51, 303-06), Clara Zelasky (Neurology PA) (J.A. 385-89, 568-69, 625-27), Dr. Lynnea Villanova (J.A. 202-04, 681-86), Dr. Luigi Troiani (J.A. 342-43, 366-67, 375-76), and Herfkens (J.A. 738-39) – all consistently opine that Stoddard is unable to return to her former occupation due to cognitive and physical impairments.

E. Unum's Termination of Stoddard's Benefits.

Beginning in March 2011, less than one month after Unum learned that it would not be able to offset Stoddard's benefits with SSA income, Unum began to request regular background searches, or Benefits Research Information ("BRI") reports, on Stoddard. (J.A. 372-74). Unum performed additional BRI searches in 2014, including one in April 2014 and another in July 2014. (J.A. 418-22, 513-31).

---

[6]Stoddard also experiences depression as a side-effect of Rebif. (J.A. 483).

The April report noted that Stoddard had a LinkedIn page and engaged in part-time employment.[7] (J.A. 418-22). The July report noted that Stoddard engaged in part-time hobbies, such as volunteering for a non-profit, travel, and horseback riding. (J.A. 513-31). After these 2014 searches, Unum decided that the 2008 neurocognitive testing somehow now did not correlate with an Attending Physician's Statement ("APS") authored by Zelasky in May 2013. (J.A. 554).

As a result, Unum sent Zelasky a letter in September 2014 (formatted differently than the 2013 APS), asking her to opine on Stoddard's work capacity within certain occupational demands. (J.A. 558-59). Zelasky returned the form on September 24, 2014 at around 9a.m., stating that Stoddard was able to perform the listed occupational demands on a full-time basis. *Id.* Within two hours of Unum's receipt of Zelasky's response, Unum informed Stoddard that it was moving forward with a review of her benefit eligibility based on Zelasky's statement. (J.A. 565). Later that same day, Zelasky's office contacted Unum, stating that Zelasky did not understand the letter, and clarified that:

> [Stoddard] is unable to work due to multiple sclerosis which has caused a cognitive impairment. She has trouble with memory, concentration and multitasking. She also has extreme fatigue. During acute flare ups her symptoms are worse. She also may have weakness, double vision, dizziness and vertigo. She is unable to perform job functions.

(J.A. 568-69). Nevertheless, Unum moved ahead with its review process, engaging

---

[7] Employment is authorized by the Plan and Unum knew of her limited work.

two of its own medical consultants – Dr. Bryan Hauser (family medicine) and Dr. Linda Cowell (neurology). (J.A. 576-88). Unum subsequently terminated Stoddard's benefits on December 2, 2014. (J.A. 591-96).

Stoddard appealed this decision. (J.A. 608-710). As part of the appeal, Unum requested another BRI search in June 2015. (J.A. 721-32). Unum enlisted two more of its employees, Dr. Jacqueline Crawford (neurology) and Dr. Jana Zimmerman (neuropsychiatry), to perform medical reviews. (J.A. 775-81, 792-801). On August 18, 2015, Unum affirmed its decision to terminate Stoddard's benefits. (J.A. 802-08).

## SUMMARY OF ARGUMENT

The district court erred in its bench ruling because Unum never conducted a reasoned, principled evaluation to determine whether Stoddard can work as a creative director. The absolutely critical issue here is Stoddard's ability (or inability) to do her prior job on a consistent, full-time basis. Instead of centering its review on this key vocational issue, Unum focused solely on whether Stoddard exaggerated her limitations. Unum became fixated on sparse Internet gleanings through BRI searches, arguing that online postings demonstrate that Stoddard is capable of greater activity than what she reported to Unum and that, *ipso facto*, she is not disabled. Unum never explained how it could extrapolate from the activities mentioned in online postings to conclude that Stoddard could consistently meet

both the physical and cognitive demands of full-time work as a creative director.

Substantial evidence supports Stoddard's disability. Driving toward its desired result, Unum selectively reviewed the evidence. There is no evidence establishing Stoddard's ability to perform the material and substantial duties required of a creative director. There is no substantial evidence showing that Unum engaged in a full and fair review of Stoddard's claim, and Unum's reliance on the "independent" medical reviews and Internet gleanings was erroneous.

As such, Unum abused its discretion in terminating Stoddard's LTD benefits, and, therefore, the decision of the district court to uphold Unum's termination should be reversed.

## **ARGUMENT**

## I.   **THE APPELLATE STANDARD OF REVIEW.**

In ERISA cases, this Court first considers *de novo* whether the relevant plan documents confer discretionary authority on the claim fiduciary to make a benefits-eligibility determination. *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011). Once the proper standard of review is identified, because the judgment below was pursuant to Fed.R.Civ.P. 56, this Court sits in the district court's shoes, employing the same standards, and reviews the district court's decision *de novo*. *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997).

## II.    THE ERISA STANDARD OF REVIEW.

Stoddard acknowledges that the Plan gives discretion to Unum in its administration of the benefit plan. However, "[a]pplying a deferential standard of review does not mean the plan administrator will prevail on the merits. It means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)). Rather, "to be upheld as reasonable under an abuse of discretion standard the Fourth Circuit requires an ERISA administrator's decision to adhere both to the text of ERISA and the plan to which they have contracted; to rest on good evidence and sound reasoning; and to result from a fair and searching process." *DuPerry*, 632 F.3d at 869. This Court considers eight nonexclusive factors to determine the reasonableness of an administrator's decision, *Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000):

> (1) the language of the Plan; (2) the purposes and goals of the Plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the Plan and with earlier interpretations of the Plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

A deferential judicial evaluation in a denial-of-benefits case must be probing, thorough, critical, and based on the entire record. Any approach employing a narrow search for evidence supporting a denial is improper.

## III.  UNUM ABUSED ITS DISCRETION IN TERMINATING STODDARD'S BENEFITS.

### 1. The Vocational Evidence Substantiates Stoddard's Disability.

Unum has never evaluated whether Stoddard can work as a creative director 8-hours-a-day, 40-hours-a-week, month after month. This is the proper inquiry; not whether Stoddard exaggerated her limitations. Instead of a proper vocational analysis, Unum focused only on the supposed inconsistencies between Stoddard's reports to Unum and her online postings.

In terminating Stoddard's LTD benefits, Unum relied exclusively on its in-house medical staff without conducting any vocational assessment. Stoddard supplied Unum with a detailed report from a certified vocational rehabilitation specialist, Patrick Clifford, who emphasized the unpredictable nature of Stoddard's illness:

> The symptoms associated with MS make it difficult for the sufferer to perform basic physical activities on a routine and regular basis, cognitive activities are also negatively affected on a routine and regular basis. The symptoms are unpredictable and flare-ups are quite common with this disease. When flare-ups do occur the sufferer may be incapacitated for days or weeks resulting in unscheduled or frequent absences from work or family life.

(J.A. 665-68). He concluded that Stoddard "is incapable of performing any work on a full-time sustained basis in the national economy." (J.A. 667). Similarly, Paula Day, an impartial vocational expert, testified under oath at Stoddard's SSDI hearing that Stoddard cannot return to her prior occupation. (J.A. 360). Unum failed to offer any rationale for dismissing these credible reports from Clifford and Day. Unum's refusal to address highly probative evidence highlights its selective review of evidence and failure to conduct a full and fair review.

Clifford's vocational report underscored the need for a high level of cognitive functioning to work as a creative director. (J.A. 665-68). This is supported by Unum's own conclusion that Stoddard's regular occupation required a high aptitude in the areas of general learning ability, verbal aptitude, spatial aptitude, and form perception. (J.A. 555-56). Further, Unum determined that Stoddard's regular occupation required the following constant "mental stress demands:" short instruction memory; detailed instruction memory; concentration and attention; work schedule; work distractions; work decisions; work completion; public interaction; work review; adaptation to change; and independent planning. *Id.*

Herfkens' 2015 neuropsychological evaluation conclusively shows that Stoddard cannot meet these heightened cognitive aptitude requirements. For example, Stoddard scored in the average range in all three tests related to learning

ability, yet her job requires a high aptitude in learning ability. (J.A. 556, 737, 740).
On a test of visuospatial functioning, she scored in the average range, but her job
requires a high aptitude in spatial functioning. *Id.* Stoddard scored in the average
range in three tests related to verbal aptitude, whereas her job requires a high
aptitude in verbal aptitude. *Id.* In short, Stoddard's progressive disease left her in,
at best, the average range of functioning in every category relevant to the
performance of her job. Clearly, average is not good enough to meet the
indisputably high demands of her job as creative director.

Further, Herfkens' neuropsychological evaluation sheds light on Stoddard's
ability to perform the "mental stress demands" of her job. Stoddard scored in the
37th percentile (low average) in sustained concentration, but her job requires
constant (5.5+ hours) concentration. *Id.* She scored in the moderately impaired
range on a test of sustained visual attention, yet her job requires constant attention.
*Id.* She scored in the borderline impaired range in a test of auditory memory and
scored in the low average range in a test of working memory,[8] but her job requires
constant short instruction memory and detailed instruction memory. (J.A. 556,
737-38, 740). She scored in the lower range of average on a test of
pragmatic/social reasoning, yet her job requires constant interaction with the

_____

[8]Working memory is a system for temporarily storing and managing information
required to carry out complex cognitive tasks such as reasoning and
comprehension. *Cone v. Carpenter*, 2016 U.S.Dist.LEXIS 54052 (W.D. Tenn.
Mar. 31, 2016).

17

public. (J.A. 556, 737, 740). In five out of eight tests of executive functioning,[9] Stoddard scored in the average range, but her job requires <u>constant</u> adherence to a work schedule, the ability to make decisions and complete work while dealing with distractions, the capacity to adapt to change, and the capability to independently plan work tasks.[10] *Id.* Finally, Stoddard's processing speed was impaired relative to her baseline functioning, which is significant, as it exacerbates all of her other problems in performing the mental stress demands. (J.A. 738-39).

Based on the objective evidence from the neuropsychological evaluation, Herfkens concluded that it would be impossible for Stoddard to return to her job:

> It is, however, clear that Stoddard's working memory abilities are weaker than they were in the past, and her processing speed is somewhat slower. She is distractible. Stoddard's previous work required her to process information quickly and accurately in meetings, teleconferences, and presentations. She had to assimilate large amounts of information to quickly and flexibly make decisions

---

[9] Executive functioning involves the ability to think abstractly and to plan, initiate, sequence, monitor, and stop complex behavior. An individual with a deficiency in executive functioning may have difficulty with tasks and situations that require processing new and complex information, and a reduced ability to: shift mental sets (i.e., multitask), generate novel verbal or nonverbal information, and execute serial motor activities. *Reid v. Metro. Life Ins. Co.*, 944 F. Supp. 2d 1279, 1310 (N.D. Ga. 2013).

[10] Stoddard's deficiency in executive functioning also substantiates her inability to function within Unum's list of "work situations," which include: "Directing, controlling or planning activities of others; Influencing people in their opinions, attitudes and judgments; Performing a variety of duties; Expressing personal feelings; Dealing with people; Making judgments and decisions." (J.A. 555-56).

18

and direct a team. These are her areas of weakness now, and she is no
longer capable of working at that level or in that position.

(J.A. 739). Indeed, Stoddard's occupational duties demanded a highly functional,
creative, organized, concentrated, and multitasking individual. (J.A. 24, 129-30,
702-03). The vocational reviewers and Herfkens uniformly agree that she can no
longer meet these intensive demands. (J.A. 360, 667, 738-39).

Unum and its medical consultants have attempted to undermine these
significant cognitive deficits by focusing on the fact that a portion of the testing
revealed "average" ability. (J.A. 582, 587-88, 593, 794, 796-99, 804, 806). Unum
misses the point. The nature and degree of cognitive impairment are variable and
depend on the particular work setting of the individual. (J.A. 739). The same level
of cognitive impairment may significantly impair a person's ability to perform a
complex job, but not a job that is less demanding. For example, a scientist, doctor,
or judge would likely be unable to function if they suffered a reduction from
superior to average cognitive ability, while such an impairment would be less
significant to a job requiring no more than average cognitive functioning.
Stoddard's job clearly required more than average cognitive ability. (J.A. 555-56).

Further, Unum ignored Stoddard's baseline cognitive abilities. A highly
intelligent individual, such as Stoddard, may be significantly impaired even with
test results that are otherwise within the realm of normal, where the individual
scores lower than an estimated baseline on cognitive tests. (J.A. 738). This is the

case here. Indeed, Stoddard's physicians felt that her test results reflected greater than indicated deficits for Stoddard, given her high baseline level of cognitive functioning, which physicians unanimously agree was in the superior range. (J.A. 544, 547, 736, 738-39, 750).

In short, Unum's review was utterly deficient. Unum not only failed to conduct a vocational review to evaluate the impact of Stoddard's impairment, but it ignored or discounted all of the vocational evidence supportive of Stoddard's claim, including two credible reports from vocational rehabilitation specialists and objective evidence from standardized neuropsychological testing.

## 2. Unum Failed to Evaluate Stoddard's Limitations in the Context of MS.

Inconsistent activity levels are the hallmark of relapsing-remitting MS patients. Indeed, as its name suggests, relapsing-remitting MS is a disease whose effects fluctuate greatly over time:

> MS is a chronic degenerative disease which affects the central nervous system, including the brain and the spinal cord. The disease is marked by an immune-system attack on the myelin, the protective insulation surrounding the nerves.

> Inflammation causes the myelin to degenerate, eventually disappear, and be replaced by sclerotic tissue. The hardened tissue retards the flow of electrical impulses that travel along the nerves, eventually causing progressive interference with vision, speech, walking, writing and memory.

> The disease is unpredictable and varies greatly from person to person… Exacerbations, periods when symptoms are active, are

20

sometimes followed by remissions, periods of calm… Approximately 85% of MS patients suffer from 'relapsing-remitting' MS, which is characterized by defined exacerbations of acute worsening neurotic functioning.

*Addis v. Ltd. Long-Term Disability Program*, 425 F. Supp. 2d 610, 615 (E.D. Pa. 2006), *aff'd*, 268 F.App'x 157 (3d Cir. 2008). Stoddard's condition and limitations must be evaluated within the context of her disease. *Id.*

Unum employed a "snapshot" approach when evaluating Stoddard's claim, focusing on how she functions for a few days here and there, as opposed to looking at how she functions overall. In *Farina v. Temple Univ. Health Sys. LTD Plan*, 2009 U.S.Dist.LEXIS 36166 (E.D. Pa. Apr. 27, 2009), the court rejected the insurer's snapshot approach that used a temporary remission of Reflex Sympathetic Dystrophy ("RSD") symptoms as the basis for terminating benefits.[11] Despite acknowledging that RSD is a variable disease wherein symptoms fluctuate, the insurer's denial was premised on plaintiff's condition as it existed on a particular day. The court stated that an insurer "must look at the record as a whole to determine whether the claimant is disabled…**This is particularly true when an individual has a chronic disorder that is known to occasionally relieve but then worsen.**" *Id.* at *44 (emphasis added).

---

[11] RSD, like MS, is a chronic neurological disorder and presents with periods of symptoms followed by periods of remission. *Id.* at *2-3.

Despite Unum's awareness that MS is a "highly variable disease" (J.A. 805), Unum's termination of Stoddard's benefits was premised on a snapshot of her condition as it was portrayed through Internet postings on a few "good days." Indeed, Unum's August 18, 2015 letter cites "publicly accessible information" that "document a level of activity inconsistent with Stoddard's reported level of functional impairment"[12] as information that supported Unum's decision. (J.A. 803). That Stoddard can exceed a certain activity level on occasion does not mean that she can consistently tolerate that level of activity throughout a 40-hour workweek as a creative director. Unum's conclusion that Stoddard could perform as a creative director, due to her ability to intermittently engage in certain activities, was unreasonable – especially in light of the unpredictable and unreliable nature of her disability.[13]

Indeed, Hauser authored an October 23, 2014 letter to Zelasky in which he asked if Zelasky was in agreement that Stoddard's horseback riding activity demonstrated her ability to perform the demands required as a creative director. (J.A. 625-27).  Zelasky responded that Stoddard could not return to work, noting

---

[12] Unum lists the following activities: volunteering, travel, design consulting, and physical activity including horseback riding, grooming horses, gardening, etc. These activities are consistent with Stoddard's incapacitating MS, given that her symptoms vary from day-to-day.

[13] Evidence of Stoddard's physical activities might be relevant if she suffered from a disease that caused constant, debilitating pain such as neuropathy (nerve damage) or osteoarthritis (joint damage). There, the ability to engage in horseback riding may signify improvement. With MS, this ability simply signifies a "good day."

that horseback riding is a "hobby that she can do around her symptoms. MS is an unpredictable disease. The symptoms come and go." (J.A. 626).

The medical records and reports from Stoddard's treating physicians demonstrate that, even if Stoddard were capable of working on the occasional days that she rode her horse or visited her family - activities that require far different cognitive functioning than her job - it is clear that she could not sustain work as a creative director on a consistent, full-time basis.

### 3. **Unum Improperly Discredited Stoddard's Subjective Complaints.**

Unum has argued that it is not required to accept Stoddard's subjective complaints, even where Stoddard has consistently reported her symptoms to her treating physicians. Unum's stance, however, is contrary to the law of this Circuit. *See DuPerry*, 632 F.3d at 869 (if a physical condition is expected to produce a subjective symptom, even in the absence of objective proof, the subjective complaints cannot be rejected); *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161 (4th Cir. 2013) (same). While Unum was not required to "simply accept [Stoddard's] subjective complaints without question," neither could Unum "simply dismiss such subjective complaints... out of hand, especially where there is objective medical proof of a disease that could cause [the symptom]." *DuPerry*, 632 F.3d at 874. Rather, a plan administrator must have "substantial conflicting

23

evidence regarding the claimant's subjective complaints[.]" *DuPerry*, 2009 U.S.Dist.LEXIS 83532, \*34-35 (E.D.N.C. Aug. 10, 2009).

Stoddard's chronic fatigue is one of the primary symptoms impeding her ability to sustain full-time employment as a creative director. (J.A. 568-69, 683-84, 702-03, 755, 766). While fatigue is subjective, it is a common – if not the most common – symptom of MS. *Sexton v. Deloitte & Touche LTD Plan*, 2003 U.S.Dist.LEXIS 5185 (D. Minn. Mar. 27, 2003) (fatigue is the most common symptom experienced by individuals with MS); *Macnally v. Life Ins. Co. of N. Am.*, 2009 U.S.Dist.LEXIS 44423 (D. Minn. May 26, 2009) ("Fatigue is perhaps the most debilitating symptom of MS."); *Harvey v. Astra Merck Inc. LTD Plan*, 348 F. Supp. 2d 536, 544 (M.D.N.C. 2004) (fatigue is a "well-known accompaniment of MS" and is "hard to quantify on examination but [is a] major factor in limiting an individual's ability to work") (internal citations omitted). Thus, it was impermissible for Unum to reject Stoddard's subjective complaints of debilitating fatigue.

Unum has attempted to justify its denunciation of Stoddard's complaints of fatigue by citing her activity level.[14] (J.A. 593, 805). The court rejected a similar argument in *Macnally*:

---

[14] For example, Cowell writes, "The insured's current activity level described in her claimant statements and phone conversations with the DBS (6/15/14 and 9/24/14) is not consistent with impairment related to fatigue that would limit or restrict the

> MacNally was rendered unable to work not only by the *severity* of his fatigue, but by its *unpredictability*. MacNally reported that, when he would go to bed at night, he would never know how much energy he would have the following day. Some days he would wake up so fatigued that he could not even drive. Nothing in the record contradicts MacNally's description of the unpredictability of his fatigue.

2009 U.S.Dist.LEXIS 44423, at *84 (emphasis in original). Likewise, nothing in the record contradicts Stoddard's consistent reporting of the unpredictability of her fatigue. (J.A. 460-61, 667, 683-84, 709, 766).

Unum has also discounted Stoddard's cognitive deficits, citing the lack of objective support. (J.A. 806). Like fatigue, cognitive impairment is a common symptom of MS. *Harvey*, 348 F. Supp. 2d at 544 (cognitive difficulties is also a "well-known accompaniment" of MS); *Barber v. Sun Life & Health Ins. Co.*, 894 F. Supp. 2d 174, 180 n.3 (D. Conn. 2012) (cognitive dysfunction is one of the "most common reasons that individuals with MS leave the work force"). As such, it was impermissible for Unum to reject Stoddard's subjective complaints of cognitive impairment.

---

full time activities described in the 9/2/14." (J.A. 587). Cowell ignores that, in the same June teleconference, Stoddard said her activities were "sporadic" and she "never [knew] when she will have an exasperation." (J.A. 460-61). Additionally, in the same September teleconference, Stoddard said she "may have 3 good days and then in bed for 2 or 3." (J.A. 571). This further evidences the selective nature of Unum and Cowell's review.

Even if that were not the law of this Circuit, there is objective proof of Stoddard's declining cognitive functioning. Stoddard's working memory score was in the low average range in 2015, which was significantly worse than her score in either 2007 (average) or 2008 (high average). (J.A. 545, 738-39, 748-49). Stoddard's 2015 speed of processing information decreased since the 2008 evaluation, resulting in a score in the 77th percentile in 2015 (2008: 87th percentile). (J.A. 544, 738-39). Stoddard performed worse on tasks demanding divided auditory attention in 2015 compared with the 2008 evaluation, earning a score in the 18th percentile, which is borderline impaired (2008: average). (J.A. 545, 737, 740). Thus, the record clearly provides objective evidence of the deleterious impact that MS has had over the past decade on Stoddard's level of cognitive functionality.

### 4. <u>Unum Failed to Properly Weigh the Evidence.</u>

Unum's decision to terminate Stoddard's benefits is ultimately traceable to the information it discovered online showing Stoddard's occasional ability to go horseback riding, travel, and engage in intermittent volunteer and part-time work. But Unum's definition of disability depends on Stoddard's ability to return to her job as a creative director, not her ability to ride a horse, occasionally travel, or intermittently volunteer. (J.A. 102).

26

As discussed *infra*, courts have consistently rejected the relevance of certain personal activities to the question of whether a claimant is capable of performing the essential duties of her own occupation on a full-time basis. Nevertheless, all of Unum's reviewers expressed skepticism of – and even rejected – Stoddard's documented limitations on the basis of those very activities:

- Hauser: "Conclusion: [Restrictions and Limitations] not supported. Analysis/Rationale:…The activities revealed in BRI searches reflect a high level of cognitive and physical capacity." (J.A. 582).

- Cowell: "In regards to the insured's reported residual physical findings… the insured has recreationally been able to remain involved in activities that require a higher level of balance such as horseback riding (member of TREC USA world champion team)." (J.A. 587).

- Crawford: "The insured's activities are inconsistent with MS which rises to the level of impairment from the sustained activities described in the vocational reviews… While not offered as an exact equivalent to her prior vocational activity, from the perspective of energy spent, the sum total of the insured's current documented activities is likely similar or greater." (J.A. 780).

- Zimmerman: In finding that there was "no evidence of static or progressive cognitive decline," Zimmerman stated, "These results were consistent with the indicators of cognitive capacity referenced in the available records (e.g., real estate classes, renovating and managing rental property, consulting work through her own business, training/competing, etc.)…" (J.A. 799).

Contrary to Unum's physicians' assertions, Stoddard's activities were unrelated to her job duties and lasted for a period of time unrepresentative of a

27

regular workweek.[15] As such, her extracurricular activities are irrelevant to the question that was before the Plan and is now before the Court of whether Stoddard is capable of performing the material and substantial duties of her regular occupation on a full-time basis.

First, Stoddard's horseback riding activities have nothing to do with performing the essential duties of a creative director. Stoddard participates in a trail riding sport referred to as "TREC." (J.A. 725). The sport involves three phases: Orienteering, Control of Paces, and a Cross-Country Obstacle Course. *Id.* The first phase "requires sound navigational skills and the ability to cover varied terrain." *Id.* In the second phase, the rider must demonstrate control of the horse. (J.A. 726). The third phase is optional[16] and includes impediments riders might come across while riding in the countryside, such as a low hanging branch. (J.A. 727).

It does not inexorably follow from Stoddard's ability to ride a horse or read a map that she is capable of enduring the physical and cognitive demands of full-time work as a creative director on a consistent basis. Stoddard's occupation required intense mental energy, including deep, rapid-paced creative thought, decision-making, organizational skills, focus and communication. (J.A. 24, 129-30,

---

[15] Similarly, being able to play a round of golf is not relevant to being able to perform a 12-hour heart surgery – either in required competencies or necessary stamina.

[16] This phase is optional so anyone can participate, regardless of ability. (J.A. 725, 727).

702-03). Common sense dictates that the cognitive skills required as a creative director and for TREC are vastly different, a fact recognized by the courts.

In *Mead v. Reliastar Life Ins. Co.*, 2015 U.S.Dist.LEXIS 89581 (D. Vt. July 10, 2015), the insurer argued that plaintiff's complaints lacked credibility because her "active life of horseback riding, exercising and other physical activities" evidenced her ability to work. The court disagreed, stating, "the Court has consistently rejected their [horseback riding and other physical activities] relevance to the question of working at a sedentary occupation." *Id.* at *35. It also faulted Reliastar because its consulting physicians "were skeptical of Mead's pain on the basis of those very activities." *Id.* Unum and its staff have engaged in precisely this improper practice.

Further, there is no evidence in the record that Stoddard rides her horse more frequently than one or two times per week, as she is able. (J.A. 571). The duration of Stoddard's rides also are quite limited. (J.A. 683-84). Stoddard acknowledges that she can complete certain physical tasks, like horseback riding or gardening, for short periods of time. However, the law in this Circuit is clear that a claimant's ability to perform physical tasks for short periods of time "does not mean that she can do those tasks with sufficient duration and regularity to maintain a sedentary job." *Montero v. Bank of Am. Long-Term Disability Plan*, 2016 U.S.Dist.LEXIS 178724, *14 (W.D.N.C. Dec. 27, 2016); *see also DuPerry*, 632 F.3d at 871

(finding that the ability to complete exercise that was limited in duration "could hardly be found to be instructive on the question of whether [plaintiff] could endure the rigors of a full workday or workweek.").

Second, Stoddard's <u>part-time</u> consulting and volunteering is not relevant to the inquiry of whether she can work <u>full-time</u> as a creative director.[17] *Thivierge v. Hartford Life & Accident Insur. Co.*, 2006 U.S.Dist.LEXIS 25216 (N.D. Cal. March 28, 2006) (holding that when claimant had good days and bad days that prevented consistent work, part-time work was not inconsistent with disability); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 441 n.7 (3d Cir. 1997) (condition may not disable individual from performing isolated activities, but rather prevents him from performing activities for any "*prolonged period of time*") (emphasis in original).

The information Unum and its consultants cite regarding Stoddard's consulting and volunteering is much more benign than Unum would have the court believe. During the 20-month period leading up to Unum affirming its decision on

---

[17] Unum violated the letter and spirit of the Plan by concluding that Stoddard's occasional consulting work is proof that she no longer is disabled. For purposes of benefit calculations, the Plan disregards earnings amounting to less than 20% of pre-disability indexed monthly earnings. (J.A. 103). In 2009, Unum informed Stoddard that she could earn as much as $980/month without affecting her benefits. (J.A. 321). Stoddard never earned this amount. (J.A. 425, 428, 437, 449). In other words, Unum terminated Stoddard's benefits based on a level of activity that was explicitly authorized by the Plan.

August 18, 2015, the record reflects no documented volunteering or consulting activity in 13 of 20 months. The other months consisted of attending a TREC meeting, sharing social media links, giving two brief presentations on hobby interests, sporadic design consulting and completing infrequent administrative tasks for the non-profit organization, such as posting one short update to the TREC website. (J.A. 526-27, 530-31, 571-72, 722, 730, 732). This level of activity is certainly not comparable to working 40-hours a week as a creative director.

Nevertheless, Crawford concluded that Stoddard's ability engage in consulting and volunteering for short periods of time was dispositive of her ability to perform full-time work:

> The insured's ability to combine consulting in her own field for firms such as Fetching Girl as well as serving as president of USNETO where she successfully redesigned logo, uniforms, promotional materials, and was able to facilitate legal changes in the bylaws to allow the organization to grow shows that she has retained the capacity to perform the essential demands of her regular occupation.

(J.A. 779). Crawford makes this illogical comparison, despite having contrary evidence from Sondra Baker, the CEO of Fetching Girl, which confirmed Stoddard's limitations in fulfilling even part-time work:

> I have also seen the effects of her illness over time, as more recently, Kim has been consulting with me on a new start-up. Kim's capacity is severely diminished, and she simply does not have the capacity to fulfill the requirements of a full-time position. She only has the energy to work for short, limited periods of time. She can't spend extended periods on the computer (which is essential to the service she provided

> to [her past employer], and which, if she were healthy, we would want her to provide my company). She becomes exhausted by meetings (another critical requirement). She is much less efficient than she was, and has difficulty multi-tasting…
>
> …we have structured a very limited engagement with Kim. I am doing so because Kim is my friend, I value her opinion and want to support her. But we have had to adjust even the normal limits of even a part-time consulting arrangement to fit the requirements mandated by her illness. We work around Kim's schedule (essentially, she decides when she can and cannot work). We don't task with her hard deadlines. We don't ask her to multi-task. We don't give her any work where she has sole responsibility. We don't ask her to participate in any company related meetings/work that require more than a few hours at a given time.

(J.A. 702-03). While Crawford had no reason to doubt the credibility of Baker, she

does so anyway:

> Upon appeal, Ms. Baker… commented that she allowed the insured to complete projects on her own schedule is noted. While this agreed-upon flexibility might be attributable to a medical condition such as MS, it is also possible that this is a function of the insured's substantial schedule of equine related activities.[18]

(J.A. 780). Reliance on such speculation is not authorized by ERISA. Moreover, if

Unum felt this issue was important, rather than pushing its reviewing physician to

engage in improper conjecture, Unum should have conducted a field visit or

medical exam to substantiate her condition and activity level.

---

[18] Courts have found an abuse of discretion where the consulting physician rejected letters from plaintiff's employer and co-workers stating that she was unable to perform her job. *Rohr v. Designed Telecomms., Inc.*, 2009 U.S.Dist.LEXIS 32404, *20 (S.D. Ohio Mar. 30, 2009).

Third, Stoddard's occasional travel does not evidence her ability to work. Unum has previously been admonished for relying on such an illogical comparison. In *Doe v. Unum Life Ins. Co. of Am.*, 35 F. Supp. 3d 182 (D. Mass. 2014), Unum and its medical reviewers found plaintiff's functional capacity to be demonstrated by his ability to travel to "France, North Carolina, and the Berkshires" and monthly trips to New York to visit family. The court stated:

> Of course, occasional travel is not the same as working a demanding day job. Doe also noted that his partner accompanied him and cared for him on these trips, which would not occur if he returned to work.[19] To be sure, Doe's ability to ride in a car or airplane hints at his ability to perform occasional sedentary activity. But to equate occasional travel with an intense professional setting indicates the same lack of contextualized understanding of Doe's health and work. And that failure to consider the evidence in its proper context suggests arbitrary and capricious review.

*Id.* at 194-95. Here, Unum has demonstrated the same "lack of contextualized understanding." Stoddard's occupation requires intense, nonstop creative functioning throughout a full workday, not the ability to sit on a plane. As such, the ability to occasionally travel has no bearing on Stoddard's ability to return to work. *Solnin v. Sun Life and Health Ins. Co.*, 2015 U.S.Dist.LEXIS 146279 (E.D.N.Y. Oct. 28, 2015) (finding that travel to Israel did not show ability to work), *aff'd*, 2017 U.S.App.LEXIS 735 (2d Cir. Jan. 12, 2017).

---

[19] Stoddard's partner, Tim Thomas, assists with traveling and other "life-tasks," including housekeeping and yard-work. (J.A. 684, 698).

Further, Unum ignored evidence showing how limited Stoddard's travel has become. Unum engaged in a similarly arbitrary and capricious analysis in *Ettel v. Unum Life Ins. Co. of Am.*, 2008 U.S.Dist.LEXIS 103419 (W.D. Wash. Dec. 10, 2008). There, each of Unum's reviewers stated that plaintiff's alleged inability to work was inconsistent with a trip she took to Hawaii and a car trip to Washington. *Id.* at *16. Unum failed to consider a statement submitted by plaintiff's friend who traveled with plaintiff to Washington, which noted that plaintiff "had to lie in the back of my van and even that didn't give her relief. She then spent a good portion of the weekend lying down because she was in such pain." *Id.* at *17. The court found that "Unum's consideration of the lay evidence and plaintiff's personal activities was impermissibly one-sided." *Id.* The court added, "[w]hile the failure to consider the opinions of lay witnesses may not constitute an abuse of discretion in every case, here it is problematic because Unum focused heavily on plaintiff's personal activities." *Id.* at *16.

Likewise, Unum's consideration of the lay evidence here was impermissibly one-sided. For example, Crawford explicitly dismisses evidence from Thomas regarding the impairments Stoddard suffered in her trip to Portugal in 2012 for a TREC Competition:

> Upon appeal, the insured and her significant other suggest that the insured did not complete her first day of the 2012 World Trec competition in Portugal due to her MS. The file does not contain

34

external confirmation that cessation of completion was due to medical concerns.

(J.A. 780). There is no requirement in the Plan that lay witness testimony must be accompanied by "external confirmation." This flippant disregard of Stoddard's evidence is impermissible.[20] *Nickel v. UNUM Life Ins. Co. of Am.*, 582 F. Supp. 2d 869, 878 (E.D. Mich. 2008) (finding denial of benefits arbitrary and capricious because Unum failed to consider plaintiff's coworker's statements that corroborated claims of extreme fatigue); *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1120 (10th Cir. 2006) (same). Unum's reviewers also ignore Stoddard's medical records that address the difficulties she had with travel and reveal that she had to make numerous preparations and adaptations in order to travel at all. (J.A. 535-37, 689, 698-99).

Further, Unum mischaracterized the evidence regarding Stoddard's travels, calling her an "avid traveler." ECF Doc. No. 31, p. 18. To make this assertion, Unum compresses over ten years of activities to create the impression that Stoddard is constantly on the go.[21] The record reflects a far different reality:

---

[20] Crawford then approvingly cites a report from Stoddard's father that Crawford interprets as supportive of her ultimate conclusion without regard for "external confirmation." (J.A. 780). This is a blatant example of selective review.
[21] Stoddard travels occasionally to Virginia, New York, and Colorado to visit family and friends.

| 2008 | Travel to Alaska and New York. Stoddard had "significant difficulties" during the end of her trip to New York and on the flight home. (J.A. 324, 327). |
|------|--------------------------------------------------------------------------------------------------------------------------------------------------------|
| 2010 | Met Thomas in New Zealand after his deployment to Antarctica. (J.A. 359). |
| 2011 | Portugal trip, discussed *supra*, unable to complete event because of MS-related fatigue. (J.A. 689). |
| 2014 | Traveled to Italy with her mother to watch TREC event. (J.A. 526, 706). |

Because Stoddard was able to occasionally participate in these limited activities does not supply evidence that her complaints lack credibility or that she can return to work. No Unum employee has offered a reasonable explanation why leisure activities of travel, occasional volunteering, and horseback riding signal the ability to consistently meet the demands of working as a creative director 40-hours per week. Instead, they have faulted Stoddard for making the choice between, on the one hand, succumbing to her fatigue and becoming inert, and on the other hand, pushing herself to engage in a certain amount of fatiguing activity in order to live a fuller life. Her choice of the latter does not prove that she is not disabled. *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 996 (N.D. Ill. 2003) ("[T]here is no requirement on the disabled to become inert in order to avoid having their disability benefits denied.").

### 5. **Unum's Attack on Stoddard's Credibility is Baseless.**

#### a. **Stoddard Was Forthcoming About Her Activity Level.**

Stoddard has been very clear that she has good days where she could function at a reasonably high level, but those are followed by bad days where she could barely function at all. In a September 26, 2014 teleconference with Unum, Stoddard stated that "probably 1 day a week she doesn't do anything" and that she "[r]eliably can try and plan for [a half] day of activity." (J.A. 571). Stoddard added that, "[s]ome days she does better and some days she doesn't. She said with MS [she] may have 3 good days and then in bed for 2 or 3 [days]." *Id.* Stoddard said she continued to do consulting work and added that she can accomplish a lot on a "good day," but "if she does do a [full] day of work she is fried and can't maintain [a] reliable schedule." *Id.* Similarly, Stoddard stated that she can complete most of her "day to day activities" when she is "feeling OK" but cannot do all the tasks at once or at a level she used to. *Id.* Finally, Stoddard added that she rides horses "1 or 2x/week if she is able to" and continues to volunteer for TREC one day a week. *Id.*

As such, on the days Stoddard was able to ride her horse or do consulting work, she was having a "good day" — which is entirely consistent with the limitations she reported to Unum. Unum has not pointed to any evidence that demonstrates Stoddard is able to engage in a high level of activity for more than

the 3-day consecutive period that she reported to Unum. Further, Unum has failed to address Stoddard's activity level (or lack thereof) within a day or two of the "good days." Nevertheless, Unum turned the alleged inconsistencies found in Internet postings, as compared to Stoddard's reports to Unum, into a character attack.

Because the Internet postings merely show Stoddard doing what she admitted to Unum that she could do – intermittent activities of limited duration – and because the Internet postings do not contradict Stoddard's reported inability to consistently meet the physical and cognitive demands required as a creative director for eight-hours-a-day and forty-hours-a-week, Unum's attack on Stoddard's credibility is misplaced and shows that Unum abused its discretion. If anything, Unum's false, unsubstantiated attacks on Stoddard's credibility underscores the arbitrariness of the review it undertook, particularly when considered in conjunction with the mounds of substantial and compelling evidence, as discussed throughout this brief, that Unum totally ignored.

Moreover, even if Stoddard exaggerated her limitations (which she did not), it does not follow that she is automatically capable of returning to work as a creative director. *Osbun v. Auburn Foundry, Inc.*, 293 F. Supp. 2d 863, 872 (N.D. Ind. 2003) (noting that it was entirely possible that plaintiff could exaggerate the

38

severity of his condition and still be permanently unable to work). Unum must still

provide a full and fair review of all of the evidence in the record.

### b. Unum Failed to Utilize Readily Available Investigatory Procedures.

The information Unum uses in its attempt to undermine Stoddard's

credibility comes primarily from Unum's BRI background searches:

> There is sufficient evidence to support that the EE has bona fide MS. **The info rev'd to date suggest that EE is overall functioning at a high level (this is based mostly on functional info obtained in the BRI search);** however, there is also consistent documentation that EE experiences intermittent fatigue, dizziness, double vision, and some degree of cognitive impairment.

(J.A. 574) (emphasis added). Despite the obvious, significant weight Unum and its

reviewers placed on this information, Unum took absolutely no action to determine

whether the online postings were representative of Stoddard's lifestyle or

otherwise further investigate Stoddard's credibility.

Instead, Unum elected to terminate Stoddard's benefits solely based on file

reviews conducted by its own employees. While the use of file reviews in the

context of benefits determinations is not *per se* improper, the use of file-only

reviews is inappropriate when a termination decision largely relies on the belief

that the claimant is not credible. *Bencivenga v. Unum Life Ins. Co. of Am.*, 2015

U.S.Dist.LEXIS 39117 (E.D. Mich. Mar. 27, 2015) ("[W]hen credibility

determinations factor significantly into an insurer's decision to terminate benefits,

39

the use of a file review is improper."); *Evans v. UNUMProvident Corp.*, 434 F.3d 866, 880 (6th Cir. 2006) (Unum's "reliance solely on file reviews by its in-house physicians is questionable in light of the critical credibility determinations made in those file reviews.").

In *Bencivenga*, the court faulted Unum for conducting file reviews when its decision turned largely on plaintiff's credibility and the applicable plan authorized additional investigatory options:

> Unum's reliance on Bencivenga's lack of credibility, coupled with the fact that [the treating physician] repeatedly indicated that Bencivenga was unable return to his past work, raises questions about Unum's decision to conduct only file reviews, particularly given its right — specifically reserved in the Policy — to conduct a medical examination.

*Id.* at *42. Likewise, the Plan here specifically reserved Unum's right to conduct a medical examination. (J.A. 102). Nevertheless, Unum failed to employ this available procedure.

In addition, Unum could have conducted a field visit or surveillance. Indeed, Unum employees suggested the use of these investigatory procedures on numerous occasions. For example, Unum's March 28, 2011 BRI report stated, "Possible avenues for support [of information found through Internet search] would be a field visit to get more details on her reported employment involvement or surveillance to get a better sense of her day to day activities." (J.A. 372). Similarly,

after completing another BRI search in April 2014, Unum initiated a review of Stoddard's capacity level. (J.A. 464-65). This report, dated July 1, 2014, stated:

> Review of capacity as it appears EE may have had an increase… Last medical review: The claimant has recently been denied for SSD. The claimant has been released to part-time employment. However, her occupation does not exist part-time on a national level. **Next step being recommended is a field visit followed by activity monitoring.**

(J.A. 464) (emphasis added). Unum never followed the recommendations from <u>its own employees</u>; instead electing to continue requesting only paper BRI reports. Indeed, no Unum employee or consultant has likely ever even laid eyes on Stoddard.

Unum was faulted by a court within this circuit for the same conduct.  In *Harvey v. Astra Merck Inc. LTD Plan*, 348 F. Supp. 2d 536 (M.D.N.C. 2004), the plaintiff suffered from MS and sought benefits under a Unum-administered LTD plan. A Unum employee reviewing the medical records indicated, "some cognitive problems mentioned in the office notes… Formal evaluation may be needed to clarify the severity." *Id.* at 543. The employee recommended that Unum obtain an MRI. *Id.* at 544. As here, Unum never followed through on the request to obtain more information. *Id.* The court criticized Unum for failing to obtain follow-up information that its own employee determined was necessary to evaluate plaintiff's claim. *Id.*

41

Further, if Unum had questions about her abilities, Unum should have asked Stoddard about her specific activities during one of its telephone interviews. Unum's failure to do so is impermissible. *Ettel*, 2008 U.S.Dist.LEXIS 103419, at *18. In *Ettel*, Unum determined that plaintiff's disability was inconsistent with her ability to travel. In finding that Unum abused its discretion, the court stated, "[e]ven though Unum interviewed plaintiff, it never asked her about the two trips or about the amount of pain they caused her." *Id.* Likewise, Unum interviewed Stoddard on September 26, 2014, well after its July 2014 BRI search.[22] (J.A. 571-72). Remarkably, Unum failed to ask Stoddard about the activities it now faults her for, including the intensity of her horseback riding, her travel, or her specific volunteer activities with TREC. Nor did Unum ask Stoddard about the days following these activities (the bad days) despite Unum's awareness that her MS produced a few good days followed by bad days. Instead, Unum chose to make assumptions and used those assumptions to attack Stoddard's credibility and undermine the substantive medical, vocational, and personal evidence supporting her disability.    It is Unum's credibility, not Stoddard's, which should be questioned.

Unum's failure to obtain readily available evidence that supported Stoddard's claim is contrary to law of this Circuit:

[22] The July 2014 BRI search included information regarding Stoddard's TREC-related activities and trip to Portugal. (J.A. 513-31).

> ERISA does not envision that the claims process will mirror an
> adversarial proceeding where the [claimant] bear[s] almost all of the
> responsibility for compiling the record, and the [fiduciary] bears little
> or no responsibility to seek clarification when the evidence suggests
> the possibility of a legitimate claim.

*Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 21 (4th Cir. 2014); *see also*

*Wilkinson v. Sun Life & Health Ins. Co.*, 2017 U.S.App.LEXIS 201, *17-18 (4th

Cir. Jan. 5, 2017) ("The point is not that Sun Life failed to be an archeologist

digging up evidence underneath a rock; quite the contrary here, Sun Life shut its

eyes to evidence in plain sight."). Rather, the law anticipates a dialogue, or "some

back and forth between administrator and beneficiary." *Harrison*, 773 F.3d at 21.

Further, "A complete record is necessary to make a reasoned decision, which must

'rest on good evidence and sound reasoning; and . . . result from a fair and

searching process.'" *Id.* (citing *Evans v. Eaton Corp. LTD Plan*, 514 F.3d 315, 321

(4th Cir. 2008)). "A searching process does not permit a plan administrator to shut

his eyes to the most evident and accessible sources of information that might

support a successful claim." *Id.* Indeed, "[a]n ERISA fiduciary presented with a

claim that a little more evidence may prove valid should seek to get to the truth of

the matter." *Id.* (internal citations omitted).

Unum's decision-making process was relentlessly focused on looking for

avenues to terminate Stoddard's claim rather than actually evaluating and

investigating her condition and limitations. Instead of conducting a medical

examination, field interview, surveillance, or simply asking Stoddard about her activities that it questioned, Unum chose to rely on inherently unreliable Internet postings[23] to support its objective of terminating her benefits.

### 6. The District Court Erred in its Application of the *Booth* Factors.

In assessing whether Unum made a reasonable decision, the court is to be guided by the *Booth* factors. Stoddard is at somewhat of a disadvantage because the district court did not issue a written Memorandum Opinion, wherein it would presumably have addressed and analyzed the relevant *Booth* factors. Thus, where appropriate, Stoddard will address the *Booth* factors that the district court seems to have relied upon based upon the transcript. Of the eight factors, the ones most relevant to this Court's review are addressed below:

### A. The adequacy of the materials considered to make the decision and the degree to which they support it.

Under the third *Booth* factor, Unum was required to consider <u>all</u> of the evidence in the record at the time of its decision. *Williams v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 525, 541 (E.D.N.C. 2008) (citing *White v. Sun Life Assurance Co.*, 488 F.3d 240, 255 (4th Cir. 2007)). Unum selectively reviewed some of the materials and ignored substantial evidence supporting Stoddard's disability. For example,

---

[23] Common sense dictates that Internet postings are misleading. People put their best foot forward. They do not typically post pictures of themselves laid low by extreme fatigue or discuss their cognitive deficits on professional websites like LinkedIn.

44

one piece of evidence before Unum was Judge Bowling's opinion. (J.A. 348-62). However, the record shows that Unum, Hauser, Cowell and Crawford all failed to consider Judge Bowling's conclusion that Stoddard could not return to her previous occupation. *See* Section III.6(D), *infra.*

Further, Unum cannot meet its obligation to fairly consider all of the evidence in the record when it cherry picks what it will consider. *Case v. Cont'l Cas. Co.*, 289 F. Supp. 2d 732 (E.D. Va. 2003) (finding materials inadequate when records were selectively reviewed). Here, the district court noted Unum's selective review:

> On the appeal, [Stoddard] submitted letters from folks that she has worked with in connection with these physical and job-related activities that Unum gave a whole lot of weight to in terminating her benefits. For example, the whole Portugal trip. There is a letter from the woman who went to Portugal with her, who says, you know, we had to make all of these accommodations for her so she could participate and compete, and then when she got there, she was only able to ride, I think she said, three-quarters of the first day, and then she couldn't finish the competition. And so that is hardly supportive of the way Unum has characterized this whole competition thing… there was [also] a letter from her employer, the person she's been working with, who noted all of these accommodations that they have to make… the actual statements about how Ms. Stoddard actually functioned in doing the job and the accommodations they've had to make, there is no real reason to doubt those, and those don't seem to have been addressed on appeal.

(J.A. 63-64). Further, in discussing Unum's treatment of the 2008 neuropsychological evaluation, the district court stated:

45

I have some questions about that, because these doctors and Unum accepted the report when it said she wasn't impaired, and rejected the parts of the report that said she was impaired. Now that's not how Unum said it, but that's what it appears to me that they did…You know, that report specifically says she has limitations… Borderline deficits, I think they called them, in executive function and complex attention. And that [Troster] thought she couldn't return to her old job.

I don't understand how Unum can credit the parts of that report saying she is not impaired, and then discredit the part of the report that says she's got borderline impairment.

(J.A. 40). Nevertheless, the district court inexplicitly concluded that this factor weighed in favor of Unum. (J.A. 79.2). The district court's finding in this regard is clearly contrary to the verbal findings made by the court on the record discussed here. Indeed, the third *Booth* factor weighs in favor of Stoddard.

## B. Whether the decision-making process was reasoned and principled.

The fifth *Booth* factor "requires the court to focus on the process that was afforded to plaintiff and his claim and whether the decision making process was both reasoned and principled." *Johnson v. Metro. Life Ins. Co.*, 2008 U.S.Dist.LEXIS 110009, *45 (W.D.N.C. Aug. 26, 2008). The decision will be found to be reasoned and principled "where it is supported by substantial evidence." *Id.* (citing *Bernstein v. Capitalcare, Inc.,* 70 F.3d 783 (4th Cir. 1995)). "Substantial evidence" is evidence which a "reasonable mind would accept as

sufficient to support a particular conclusion." *Id.* (citing *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197 (4th Cir. 1984)).

The most serious flaw in Unum's review was its failure to evaluate whether Stoddard can perform her regular occupation on a consistent basis. How can a decision-making process be "reasoned and principled" when Unum failed to analyze the single most relevant inquiry under the Plan? As the district court correctly noted:

> … I didn't really see that your doctor really looked carefully at the requirements of the job. They also seem to have fallen victim of what you just characterized as a subjective view, because they just said, oh, look, she can ride a horse, and she goes to Portugal so, therefore, she can work full time. I exaggerated. That is really not what they did. They did not appear to have done a careful analysis of a vocational review of the job requirements, either.

(J.A. 61). Nevertheless, the district court inexplicitly concluded that this factor weighed in favor of Unum. (J.A. 80). The district court's finding in this regard is clearly contrary to the verbal findings made by the court on the record discussed here.

Moreover, Unum did not conduct its investigation of Stoddard's activity level in a reasoned and principled manner. *See* Section III.5(b), *supra*. Indeed, Unum failed to: conduct an in-person medical exam as permitted by the Plan; obtain a peer-review from an independent physician; obtain surveillance; or conduct a field visit. A district court in this circuit recently held that these failures

evidence the unreasonableness of a plan administrator's investigation:

> 1. Defendant Aetna's decision-making process was not reasoned and principled
> …
> Defendant Aetna emphasizes the number of board-certified peer reviewers who reviewed Plaintiff's files, but not a single one physically examined Plaintiff. Defendant Aetna did not order an independent medical    exam; nor did it obtain surveillance    video of Plaintiff in an effort to rebut her    claims—a    piece    of rebuttal evidence often obtained when insurance    companies  believe a claimant is fabricating or exaggerating debilitating pain, yet no such video was obtained here.

*Montero*, 2016 U.S.Dist.LEXIS 178724, *12-16; s*ee also Wilkinson v. Sun Life & Health Ins. Co.*, 127 F. Supp. 3d 545, 566-67 (W.D.N.C. 2015) (in finding that the fifth *Booth* factor weighed in favor of claimant, the court concluded that "Sun Life did not engage in a searching or 'leave no stone unturned' investigation" when it did not seek out information to clarify any questions it had), *aff'd*, 2017 U.S.App.LEXIS 201 (4th Cir. Jan. 5, 2017).

As discussed throughout this brief, Unum's selective review also supports a finding that the fifth *Booth* factor weighs against the reasonableness of Unum's decision. Where a fiduciary goes through the motions of providing a review process, but cherry-picks the information upon which it will rely, a reasoned and principled review has not taken place. These actions are significant to the court's evaluation as "[i]f the decision was not reasoned and principled, the other factors will be of no consequence." *Johnson*, 2008 U.S.Dist.LEXIS 110009, at *38.

## C. Whether the decision was consistent with the procedural and substantive requirements of ERISA.

While the district court incorrectly found that "there is nothing to indicate any problems with the procedural and substantial requirements," this Court should find that the sixth *Booth* factor weighs heavily in favor of Stoddard. (J.A. 80). Participants are entitled to a "full and fair review" by the plan administrator. 29 U.S.C. § 1133. A plan administrator is analogous to the trustee of a common-law trust, and courts "should consider a benefit determination to be a fiduciary act (i.e., an act in which the administrator owes a special duty of loyalty to the plan beneficiaries)." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). Further, the safeguards of 29 U.S.C. § 1133 require that a claimant must be given:

> the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits, and the claims administrator must take any such materials submitted into account in deciding the appeal. § 2560.503-1(h)(2)(ii), (iv). Under either standard of review--de novo or abuse of discretion--the administrator must comply with these procedural guidelines.

*Hall v. Metro. Life Ins. Co.*, 259 Fed. Appx. 589, 593 (4th Cir. 2007). Indeed, ERISA's procedural requirements are intended to generate a "meaningful dialogue" between claim administrators and beneficiaries. *Id.*

In this case, Unum failed to consider statements submitted by Stoddard's employer that demonstrated her limitations in fulfilling the requirements of even a part-time job, as well as the hardship Stoddard faced while traveling. *See* Section

49

III.4, *supra*. It also totally ignored two vocational reviews that found Stoddard was unable to meet the demands of her prior occupation. *See* Section III.1, *supra*. Finally, it failed to consider a contrary analysis and decision by Judge Bowling. *See* Section III.6(D), *infra.* In doing so, it violated the requirements of ERISA.

As discussed, Unum also failed to have the "meaningful dialogue" with Stoddard that is required by 29 U.S.C. § 1133. *See* Section III.5(b), *supra*. Indeed, Unum failed to obtain clarification regarding Stoddard's activity level through readily accessible means – including medical examinations, field visits, surveillance, or simply asking Stoddard for clarification. *Ettel*, 2008 U.S.Dist.LEXIS 103419, at *18 (Unum's failure to ask the claimant for clarification is inconsistent with the "meaningful dialogue between ERISA plan administrators and their beneficiaries that is the heart of the statute's protections"). As a result, the sixth *Booth* factor weighs against the reasonableness of Unum's decision.

**D. Any external standard relevant to the exercise of discretion.**

The SSA opinion serves as an important external standard that Unum ignored in making its determination:

*1. Unum Disregarded the Evidentiary Finding of the ALJ.*

Judge Bowling conducted an SSDI evidentiary hearing and concluded that Stoddard was <u>not</u> capable of returning to her prior job:

50

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

At the hearing, Paula Day, an impartial vocational expert testified that the claimant's past relevant work as a computer designer is classified as skilled requiring; sedentary exertion in the Dictionary of Occupational Titles (DOT) and her work as a freelance arts director set designer is classified as skilled requiring light exertion in the DOT. The claimant cannot return to any of her past relevant work because she is unable to perform most of the exertional and non-exertional requirements of these jobs.

(J.A. 360). However, because Judge Bowling found that Stoddard had the ability to perform <u>some</u> work, her claim for SSDI benefits was denied.[24] (J.A. 362).

Despite the fact that Judge Bowling concluded that Stoddard <u>could not</u> return to her regular occupation, Unum incorrectly trumpeted Judge Bowling's opinion as evidence that <u>supported</u> its decision to terminate Stoddard's benefits in its August 18, 2015 termination letter. (J.A. 805). Because Judge Bowling's opinion directly contradicts Unum's decision to terminate Stoddard's benefits, it is impossible that Unum thoroughly reviewed and considered the SSA determination.

It appears Unum simply relied upon the first page of the determination which reads "Notice of Decision – Unfavorable" (J.A. 348) and failed to consider the substance of the decision, which was that Stoddard could no longer perform the

---

[24] Under the SSA's definition of disability, Stoddard must be unable to perform *any kind* of substantial gainful work, whereas the Unum policy requires Stoddard to show that she is limited from performing the material and substantial duties of her *regular occupation*.

duties of her past work. Many courts in this circuit have concluded that a plan administrator's failure to consider a relevant SSA finding constituted an abuse of discretion. *Hines v. Unum Life Ins. Co. of America*, 110 F. Supp. 2d 458, 468 (W.D. Va. 2000) ("While Unum is not bound in any way by the determinations of the ALJ, it should have at least considered those findings as relevant evidence."); *Thomas v. ALCOA Inc.*, 2008 U.S.Dist.LEXIS 67668, *37 (D. Md. Sept. 5, 2008); *Walden v. Rexam, Inc.*, 2007 U.S.Dist.LEXIS 40098, *30-32 (D.S.C. June 1, 2007) (failure to address SSA decision amounted to abuse of discretion).

*2. Unum Failed to Provide the Full SSA Opinion to its Reviewers.*

More egregiously, Unum failed to provide Judge Bowling's full opinion to the majority of its reviewers, leaving them with a misguided view of the judge's findings. Hauser notes in his November 2014 report, "SSD - Unfavorable ALJ decision 2/16/11 **(page 1 only)**." (J.A. 577) (emphasis added). Page one reads, "Notice of Decision – Unfavorable" and does not provide any of Judge Bowling's findings noting Stoddard's inability to return to work as a creative director. (J.A. 348). Unum's failure to provide Hauser with highly relevant evidence underscores its abuse of discretion. *Robertson v. Std. Ins. Co.*, 139 F. Supp. 3d 1190 (D. Or. 2015) (holding that plan administrator's failure to provide SSA decision letter to any of its consulting physicians for file reviews evinces an abuse of discretion).

Likewise, there is no evidence that Cowell or Crawford considered the full SSA determination. Importantly, Crawford stated:

> While the insured and some of her supporters suggest she does not have the stamina to resume her prior full-time occupation, the preponderance of the evidence suggests, that the sum total of her current activities meet or exceed the endurance requirements of her regular full-time occupation.

(J.A. 779). Because it is unlikely that Crawford would include the SSA - an objective governmental body that undertakes a thorough review of applicants' eligibility for benefits - as among Stoddard's "supporters," Crawford appears unaware that the SSA in fact determined Stoddard was unable to return to work as a creative director. Further, neither doctor listed the SSA determination letter as a document they reviewed as part of their paper review nor discussed Judge Bowling's findings other than to mention that the decision was "unfavorable." (J.A. 586, 778).

Similar facts were present in *Chavarria v. Metro. Life Ins. Co.*, 69 F. Supp. 3d 596 (E.D. La. 2014). There, the SSA declined to award plaintiff disability benefits; however, the ALJ found that "[t]he physical demands of [plaintiff's] past work exceed his residual functional capacity." As is the case here, the applicable definition of disability in *Chavarria* required that plaintiff be unable to perform his regular occupation. *Id.* at 600. The court stated that MetLife's medical consultant

"mentioned the presence of the unfavorable SSA decision but did not discuss any of the ALJ's findings." *Id.* at 602. Further:

> While it is true that the SSA declined to award Plaintiff disability benefits, the ALJ specifically found that '[t]he physical demands of [Plaintiff's] past work exceed his residual functional capacity.' The SSA decision was in direct conflict with Defendant's finding that Plaintiff can return to work as a bodyman. Defendant's denial does not mention, much less attempt to address, this discrepancy.
>
> Indeed, the record is devoid of any evidence that would suggest that Defendant afforded the SSA decision any consideration at all. Dr. Kalen mentions that the SSA denied benefits but does not discuss the decision. The Court cannot say with confidence that Dr. Kalen or any of Defendant's employees even read the ALJ's decision. Instead, it appears that Defendant may have viewed the fact that the decision was unfavorable as a fact supporting its decision to deny benefits.

*Id.* at 604. As a result, the court determined that MetLife abused its discretion. *Id.*

While Cowell and Crawford both mention the presence of the "unfavorable" decision, neither discusses Judge Bowling's actual findings and analysis. Unum's failure to provide its reviewers with Judge Bowling's full analysis certainly raises the question of whether it attempted to bias its consultants in favor of Unum's desired outcome.

In short, it appears that Unum and its medical consultants failed to read, much less consider, Judge Bowling's decision. As it is that insurers stand to financially benefit from the government's determination that a claimant is disabled, they should also have to give appropriate weight to that determination. *Hines*, 110

54

F. Supp. 2d at 468; *Boggio v. Hartford*, 2009 U.S.Dist.LEXIS 25478 (D. Kan. March 25, 2009) (finding that insurer's complete disregard of a SSDI evidence of a conflict). Because Judge Bowling determined that she could not return to her regular occupation, the seventh *Booth* factor weighs in favor of Stoddard.

### E. The fiduciary's motives and any conflict of interest it may have.

Unum has a clearly defined "structural conflict of interest" which must be considered in determining if the benefit denial was reasonable. *DuPerry*, 632 F.3d at 869. Where (as here) the claims administrator both evaluates and pays the benefits claims, the court must consider the conflict of interest as a factor in determining whether there was an abuse of discretion, giving close scrutiny to the decisions made by conflicted administrators. *Glenn*, 554 U.S. at 115. Because of this dual role of evaluating and paying benefits claims, the decision "must meet a heightened standard of objective reasonableness and be more strongly supported by objective and substantial evidence." *Simmons v. Prudential Ins. Co. of Am.*, 564 F. Supp. 2d 515 (E.D.N.C. 2008) (citing *Ellis*, 126 F.3d at 232-33). Against this standard, the court must determine whether Unum's decisions regarding Stoddard's claim "would have been made by a fiduciary acting free of the interests which conflict with those of the fiduciary." *Ellis*, 126 F.3d at 233.

55

A structural conflict of interest alone is generally insufficient to increase a court's skepticism, but where additional factors raise questions about the insurer's motives, this factor should be given more weight. A court recently found:

> What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records. A court may view a conflicted administrator's decision with a low level of skepticism where a structural conflict of interest is unaccompanied, for example, by any evidence of malice or self-dealing. In contrast, "a court may weigh a conflict more heavily where the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence; or fails to credit a claimant's reliable evidence.

*Yancy v. Utd. Omaha Life Ins. Co*., 2015 U.S.Dist.LEXIS 172233, *50-51 (C.D. Cal. Dec. 18, 2015).

Rather than taking steps to reduce potential bias, Unum's claim handling procedures exacerbated the impact of its inherent conflict of interest. Unum's practices included: 1) reliance on individuals who, though termed "medical consultants," are Unum employees; 2) patent failures to comply with ERISA's substantive and procedural requirements; 3) a highly selective review of the medical evidence; 4) failure to utilize readily available investigatory procedures, including an IME, field visit, or surveillance; and 5) intentional disregard of significant evidence in the record.

Further, Unum's conflicted motive is shown by its treatment of Judge Bowling's evidentiary findings. Unum forced Stoddard to apply for SSDI benefits - encouraging her to argue that she was incapable of working full-time in any capacity - in hopes of receiving the bulk of the benefits of her success in doing so, and then later ignored the agency's finding in concluding that Stoddard could not return to her previous occupation. (J.A. 287, 313, 338-39, 344-45). This justifies giving additional weight to the conflict-of-interest factor. *Montero*, 2016 U.S.Dist.LEXIS 178724, *17-18 (finding a "significant conflict of interest" where the plan administrator encouraged plaintiff to apply for SSDI benefits). Finally, the timing between Unum's receipt of Judge Bowling's opinion, which is when Unum learned that it would not be able to offset Stoddard's benefits with SSA income, and Unum's initiation of the BRI searches certainly raises the question of whether Unum had a conflicted financial motive.[25]

If Unum were a truly independent administrator, it would have: 1) enlisted a full and fair review by independent physicians; 2) engaged in a "meaningful dialogue" with Stoddard regarding her activity level; 3) fully and fairly considered both the objective and subjective medical information in the record; 4) followed the advice of its own employees and obtained surveillance, a field visit, or an IME; 5) considered the vocational reports submitted; 6) read and considered Judge

---

[25] Unum received Judge Bowling's opinion on March 11, 2011 (J.A. 348) and obtained the BRI report on March 28, 2011. (J.A. 372).

Bowling's opinion and provided it to its reviewing consultants; and 7) considered the lay evidence offered by Stoddard on appeal. But it did not. Unum's inexplicable failure to take any of these actions evince its conflicted motive.

Despite Unum's tainted decisional process, the district court simply concluded: "There are motives and conflicts of interest, but I just don't see that in this case as weighing strongly in favor of Ms. Stoddard." (J.A. 81). However, there should be no question that the eighth and final *Booth* factor also weighs in favor of Stoddard.

**CONCLUSION**

Instead of meeting the "higher-than-marketplace" fiduciary obligations that are required by ERISA, Unum engaged in a serious discounting of all evidence that tended to support Stoddard, while placing enormous weight on evidence that could be construed to support Unum's desired result. As such, Unum failed to conduct a full and fair review of Stoddard's claim, and, therefore, abused its discretion.

If Stoddard's claim is reversed or remanded, Unum will have the right and opportunity to conduct the legally required review of her disability. Should Unum then conclude that she is not disabled, it can again seek to terminate her benefits. However, if the district court's decision is affirmed, the harm to Stoddard is permanent and devastating. Indeed, she will forever lose all LTD benefits, despite Unum's manifest bias and serious errors.

58

Stoddard respectfully asks this Court to VACATE the judgment of the Court below, and REMAND with directions to enter judgment in favor of Stoddard against Unum, and such other proceedings as are consistent with this Court's opinion.

This the 10th day of February, 2017.

/s/Caitlin H. Walton
**CAITLIN H. WALTON**
N.C. Bar No. 49246
cwalton@essexrichards.com
**EDWARD G. CONNETTE**
N.C. Bar No. 9172
woody@essexrichards.com
**ESSEX RICHARDS, P.A.**
1701 South Boulevard
Charlotte, NC 28203
Phone: (704) 377-4300
Fax: (704) 372-1357

*Attorneys for Plaintiff-Appellant*

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 16-2065   **Caption:** Kimberly Stoddard v. First UNUM Life Ins. Co.

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines; Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines; any Reply or Amicus Brief may not exceed 7,000 words or 650 lines; line count may be used only with monospaced type]*

☑   this brief contains _____13,945_____ [*state the number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐   this brief uses a monospaced typeface and contains _____ [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

*[14-point font must be used with proportional typeface, such as Times New Roman or CG Times; 12-point font must be used with monospaced typeface, such as Courier or Courier New]*

☑   this brief has been prepared in a proportionally spaced typeface using
MS Word 2016 [*state name and version of word processing program*] in
Times New Roman, 14 point [*state font size and name of the type style*]; *or*

☐   this brief has been prepared in a monospaced typeface using
_____ [*state name and version of word processing program*]
with _____ [*state number of characters per inch and name of type style*].

(s) Caitlin Walton

Attorney for appellant

Dated: 2/10/2017

Rev. 03/03/11

# CERTIFICATE OF SERVICE

I certify that on <u>2/10/2017</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Womble Carlyle Sandridge & Rice, LLP
James A. Dean
Patrick G. Spaugh
One West Fourth Street
Winston-Salem, NC 27101
Telephone: 336-721-3600
jdean@wcsr.com
pspaugh@wcsr.com

/s/ Edward G. Connette
_____
Signature

2/10/2017
_____
Date